UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

NOEL D. GAMBOA,

                                    Plaintiff,                          Case No.:

                    -against-
                                                                **COMPLAINT**

CITY UNIVERSITY OF NEW YORK, YORK
COLLEGE and RONALD THOMAS,                           **Jury Trial Demanded**

                                    Defendants.

-------------------------------------------------------------------X

Plaintiff, NOEL D. GAMBOA ("Plaintiff" or "Mr. Gamboa"), by and through his

attorneys, THE SELTZER LAW GROUP P.C., files this Complaint against Defendants,

CITY UNIVERSITY OF NEW YORK, YORK COLLEGE ("Defendant CUNY") and RONALD

THOMAS ("Defendant Thomas") (collectively, "Defendants"):

## <u>INTRODUCTION</u>

1.    Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, as

      amended, 42 U.S.C. § 2000e ("Title VII"); the New York State Human Rights Law,

      N.Y. Exec Law §§ 296 and 297 ("New York State Human Rights Law or NYSHRL")

      and the New York New York City Administrative Code § 8-107 et seq.; and New

      York City Administrative Code § 8-130, et seq. ("New York City Human Rights Law

      or NYCHRL").  Specifically, Defendants failed to promote and/or hire Plaintiff and

      subjected him to a hostile working environment on the basis of his race. Plaintiff

      seeks appropriate monetary relief, as well as appropriate equitable relief, to redress

      the wrongdoing complained of herein.

## STATEMENT PURSUANT TO LOCAL RULE 9

2.    For purposes of complying with Local Rule 9, Plaintiff states that he has no corporate

parent, subsidiary or affiliate, and that there are no other interested parties.

## JURISDICTION AND VENUE

3.    Plaintiff invokes this Court's jurisdiction pursuant to pursuant to 29 U.S.C. § 201 et

seq., including 29 U.S.C. 216(b), and 28 U.S.C. § 1331.

4.    This Court has supplemental jurisdiction over Plaintiff's NYCHRL and NYSHRL

claims pursuant to 28 U.S.C. § 1367(a), in that this district court has original

jurisdiction in this action and the claims are related to claims in the action within such

original jurisdiction that they form a common nucleus of operative facts.

5.    Venue is proper in this district pursuant to 28 U.S.C § 1391(b), because a

significant portion of the events giving rise to Plaintiff's claims herein occurred in this

district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.    On December 19, 2018, Plaintiff filed his Charge of Discrimination ("Charge of

Discrimination") with the United States Equal Employment Opportunity Commission

(the "EEOC") against YORK CUNY, alleging race discrimination and failure to

promote.

7.    The Charge of Discrimination was assigned Charge No. 520-2019-01307.

8.    On August 22, 2019, Plaintiff received a "Notice of Right to Sue within 90 days"

with reference to his Charge of Discrimination from the EEOC.

9.    Plaintiff commenced this action within the time prescribed by the Notice of Right to

Sue.

## THE PARTIES

10.     Plaintiff is Asian and resides in Queens County, State of New York.

11.     Defendant CUNY is comprised of various senior and community colleges, graduate and professional schools, research facilities, institutes and consortia. Its headquarters and principal place of business is in Manhattan.

12.     York College is a senior college within the public university system of CUNY, located at 94-20 Guy R. Brewer Blvd. Jamaica NY 11451.

13.     Defendant Ronald Thomas is black, and is the Vice President for Administration and Finance and Chief Operating Officer of York College.

14.     Defendant Thomas was Plaintiff's direct supervisor at the time of the occurrence of the events giving rise to the claims asserted herein.

## FACTUAL ALLEGATIONS

*Plaintiff's Professional Credentials and Work History with Defendant CUNY*

15.     According to its website, York College was established in 1966 and is one of the senior colleges in the largest city university system in the world.

16.     York College's campus facilities are comprised of seven (7) major buildings spread across 50 acres.

17.     CUNY currently employs more than 600 people that are assigned to York College.

18.     Plaintiff is a licensed Professional Architect since 1993 in two states within the United States.

19.     Plaintiff also obtained his architect's license in the Philippines prior to immigrating to the United States.

3

20.	Plaintiff obtained his Bachelor's degree in Architecture, with honors, in 1985 from the University of the Philippines.

21.	In earning his degree, Plaintiff completed course work focused on building operations including, but not limited to, Plumbing and Sanitary services, Mechanical and Electrical System of Buildings, Acoustics and Lighting.

22.	The primary language of the educational system in the Philippines is English.

23.	Plaintiff has approximately 35 years of diversified professional experience in the fields of planning, design, construction, facilities and building operations.

24.	Plaintiff was a faculty member with Parson's School of Design and the New York School of Interior Design for approximately ten (10) years, where he taught a course in Building Construction Documents Manual and Computer Aided Drafting and Design.

25.	In August 1999, Plaintiff became employed by CUNY as a University Architect Level 2 at the Brooklyn College Campus.

26.	In this position, Plaintiff successfully designed, managed, outlined Scopes of Work and prepared budgets for in-house and capital projects, and supervised and collaborated with professionals in Facilities Planning and Operations.

27.	In August 2002, York College hired Plaintiff to the advertised position of Director of Space Planning and Facilities Services, with the functional title as Director of Facilities Operations.

28.	Plaintiff's duties as Director of Space Planning and Facilities Services included: providing leadership and direction to space planning and construction, maintenance, buildings and grounds, cleaning and facilities management; being responsible for the

4

College's capital projects and their associated budgets; serving as York College's liaison on facilities related matters; compliance with appropriate construction and building codes;   and representing the Vice President and York College as appropriate.

29. In 2004 Defendant Thomas was appointed as York College's Dean of Administrative Affairs and became Plaintiff's direct supervisor.

30. Since 2002, Plaintiff has provided leadership, direction and supervision to all sectors of the Buildings and Grounds Maintenance and Operations crew for all the in-house and capital funded facilities projects of York College.

31. Since 2002, Plaintiff has authored and justified the majority of budget funding requests that resulted in hundreds of millions of dollars in funding for York College's capital improvement plans. Plaintiff worked closely with Defendant Thomas in achieving this funding.

32. From 2002 until 2012, Plaintiff personally managed planning and operations functions for York College.

33. Plaintiff has initiated, managed and/or has been involved in all facilities projects for York College campus, particularly with respect to the operations staff.

34. Plaintiff has supervised electricians, carpenters, plumbers, engineers and other trades with respect to "in house" and capital related projects which either he or outside consultants designed.

35. Plaintiff managed the entire York College campus' "State of Good Repair Work and Funding" projections to year 2020, which covered all infrastructure operational systems and subsystems of all buildings.

36.     Through his significant role in capital improvement planning, Plaintiff has been highly instrumental in obtaining hundreds of millions of capital funding dollars for York College.

37.     Plaintiff has a lengthy history of timely completion of major projects at York College coupled with development of creative strategies for obtaining funding from multiple sources.

38.     Since 2002, due to his technical knowledge, Plaintiff has served as "Search Committee Chair" for various facilities positions including Carpenter, Chief Custodian, and the Senior Stationary Engineer, which supervised the Oilers and Thermostat Repair Technician.

39.     In 2007, Plaintiff addressed the dangers of York College's main building underground electrical lines being susceptible to water infiltration and potential grounding that could lead to a major shutdown, which prompted an emergency remediation project to relocate the endangered lines above ground.

40.     Throughout his 17 years of working at York College, Plaintiff, who has completed hundreds of projects in a timely manner within the allocated budget, has received consistently favorable performance evaluations.

42.     Plaintiff has received many commendations for his work from various York College departments.

43.     In 2009 the President of York College conferred upon Plaintiff the prestigious Thurgood Marshall College Fund "Outstanding Performance in Facilities Management" award.

**Defendant Thomas' First Manifestation of Impermissible Bias**

44.    In September 2008, Defendant Thomas prepared Plaintiff's performance evaluation.

45.    In the 2008 evaluation, Defendant Thomas assessed Plaintiff's performance as "outstanding."

46.    However, in the evaluation, Defendant Thomas also stated that Plaintiff's oral communication is sometimes difficult to understand as sentences are sometimes incomplete.

47.    This comment constituted discriminatory stereotyping of Plaintiff, who is Asian.

48.    Plaintiff verbally complained to Defendant Thomas about this remark.

49.    The impermissible bias reflected in Defendant Thomas' comment has negatively impacted Plaintiff since the comment's utterance.

50.    At no other time during his lengthy and accomplished career within the CUNY system, was Plaintiff made aware of any criticisms about his verbal communication skills.

51.    Throughout his CUNY career, Plaintiff presided over numerous project meetings and has given speeches and provided training to large groups of people.

52.    No complaints were registered about Plaintiff's communication skills on any of these occasions.

**Defendants' History of Marginalizing Plaintiff**

53.    From 2004 to 2011, Defendant Thomas never allowed Plaintiff, the Head of Facilities, to address the department issues in public. Instead, Defendant Thomas asked Plaintiff about issues and accomplishments and then delivered the Facilities updates himself in public meetings.

54. In contrast to Plaintiff, other Department heads reported on the status of their departments in Cabinet and Directors' meetings.

55. In 2011, Plaintiff applied for the posted position of Executive Director of Facilities at York College.

56. One month later, the posting was abruptly discontinued and an interim executive director was hired to serve for the next two years.

57. Plaintiff complained to the President of York College, Marcia Keisz, who is black, that he should have been considered for the interim position.

58. The President of the College was hostile to Plaintiff's complaint and falsely stated that Plaintiff was not interested in the position.

59. The President of the College also strongly suggested that Plaintiff's language skills were poor. She accosted Plaintiff for the use of the word "charming" when Plaintiff started the conversation by complimenting his supervisor, Defendant Thomas as "eloquent and charming" to avoid any animosity.

60. The President of York College stated to Plaintiff that his use of the word "charming" is improper, implying that Plaintiff's vocabulary is limited because he is Asian.

61. In February 2014, James Minto, who is black, was hired as the York College Executive Director of Facilities and Operations.

62. In or about June 2015, Mr. Minto introduced Plaintiff to a third party as a Project Manager even through Plaintiff held the title of Director of Facilities Planning and Operations.

63. In or about March 2016, York College appointed Oslene Carrington as Executive Director of Economic and Workforce Development.

64. Ms. Carrington, who is black and possessed no background in facilities, was assigned by Defendant Thomas to manage high priority design and construction projects.

65. In or about September 2016, Plaintiff registered a complaint of discrimination with York College's designated anti-discrimination investigatory officer.

66. Plaintiff's complaint referenced the York College President's false statement about Plaintiff's communications skills, which echoed the discriminatory stereotyping of Asians by Defendant Thomas in the 2008 performance evaluation.

67. No formal findings were ever rendered concerning Plaintiff's complaint of discrimination.

68. From 2002 to 2017, Plaintiff' repeatedly informed Defendant Thomas that he was not hired to function as a consultant architect for York College, as Defendant CUNY has specific titles for said function, and should be compensated for executing complex professional work performed mostly after work hours to meet the demands of York College.

69. In or about February 2017, Plaintiff's union filed a grievance to address out-of-title assignments given to him by York College.

70. Defendants, and particularly Defendant Thomas, required Plaintiff to execute design and construction documents that were required to be filed with the New York City Department of Buildings because Plaintiff was a registered architect.

71. Plaintiff and the York College construction crew, however, did not have the required insurance and other required documents that were needed in order to lawfully sign off on the College's documents and build based upon them.

72.   Plaintiff's job description did not include execution of design and construction documents.

73.   Plaintiff's job description did not require him to be a registered architect.

74.   Defendant Thomas incorrectly stated to Plaintiff on several occasions that CUNY is "exempt" from the Building Department requirements.

75.   Defendants also demanded that Plaintiff engage in re-design work in order to address an access claim under the Americans with Disabilities Act with respect to the College's restrooms, even though the necessary permitting was not obtained.

76.   Due to the continuing hostile and unlawful demands imposed upon Plaintiff by Defendants, the stress associated with filing a union grievance and complaint of discrimination as well as Plaintiff's fear of permanent revocation of his license due to non-compliance with Building Department requirements, Plaintiff was unable to take required continuing education credits throughout the renewal period and did not renew his architect's registration with the State of New York.

77.   In December 2017, Defendant CUNY's Office of Labor Relations issued a directive that Defendant CUNY to cease and desist from assigning professional architectural consultant work to Plaintiff.

78.   However, shortly thereafter during the month of December 2017, a demand was made that Plaintiff renovate a suite in a manner that would require professional architectural consultant work.

79.   In or about February 2018, Defendants downgraded Plaintiff's title from "Director of Facilities Operations" and "Director of Campus Planning and Facilities Services" to

"Director of Space Planning" even though there was no corresponding adjustment in Plaintiff's duties and responsibilities.

80. Plaintiff's downgraded title, which is perceived as limited to a focus on space allocation, was a blatant attempt by the Defendants to reduce his credibility in Facilities Operations and chances of promotion, thus further marginalizing him.

### The Unlawful Denial of Plaintiff's 2018 Application for Executive Director of Facilities Planning and Operations

81. In March 2018, York College issued a job posting for "Executive Director of Facilities Planning and Operations."

82. Plaintiff applied for this position, which constituted a promotion for Plaintiff.

83. According to its website, York College adheres to an Affirmative Action Plan.

84. Based on the website's Affirmative Action Plan reports, Asian individuals have been underrepresented at the York College executive director level continuously for at least the past 15 years.

85. From 2004 to present, not a single individual of Asian origin has held an executive level position at York College.

86. On numerous occasions Plaintiff has requested promotion from Defendant Thomas, who falsely stated that the College has no obligation to promote Plaintiff because he was at the top of his unionized position tier.

87. Advancing to the executive level, however, would constitute a promotion in title, salary and function for Plaintiff.

88. The York College Search Committee Guide states that search committee shall consist of individuals who have enough knowledge and skill to effectively evaluate

candidates and that committee members may also be potential colleagues, internal customers, or knowledgeable experts in a field or discipline.

89. Defendant Thomas served as the hiring manager of the Search Committee.

90. As hiring manager, Defendant Thomas was responsible for selecting members of the Search Committee.

91. There were no Asian individuals serving on the Search Committee.

92. The Search Committee did not include any representative from the Facilities, Planning and Operations departments, which was necessary pursuant to the Search Committee Guide in view of the technical knowledge needed to make an informed hire.

93. For prior facilities personnel hires, the Search Committee chair and/or many of its members would historically be representatives of the Facilities Department to ensure proficient candidate screening.

94. Defendant Thomas did not adhere to these practices and protocols in the search for an Executive Director for Facilities Planning and Operations.

95. The search committee interviewed Plaintiff for the vacant position.

96. Plaintiff's interview was a first-round interview.

97. Two of the search committee members present for Plaintiff's interview who represented the College's faculty were white males who taught in the same department, had adjoining offices and co-wrote numerous articles together, demonstrating a lack of diversity within the search committee.

98. The selection process was further flawed, and departed from standard practice, because only five of the seven Search Committee members participated in the Plaintiff's interview.

99. The job posting for the Executive Facilities Director position listed the following qualifications for the position: "[a] minimum of 10 years of experience in progressively responsible facilities management positions and/or in leading major capital projects; at least five years of leadership/management/supervisory experience of registered and/or licensed professionals including but not limited to building trades, architects and engineers highly preferred."

100. Plaintiff amply possessed all of the posting's qualifications through his lengthy and successful tenure as York's Facilities Director.

101. For nearly ten (10) years prior to the creation of the Executive Facilities Director position in 2012, Plaintiff was the representative of the Facilities Department in all matters of significance and consequence and effectively served as the leader of the Department.

102. In fact, since the creation of the Executive Facilities Director position, only three capital improvement projects have been completed at York College outside of emergency repairs, in comparison with over 100 capital improvement and in-house projects and repairs completed during Plaintiff's *de facto* leadership of the department prior to 2012.

103. The Executive Director of Facilities position was awarded to a white male named David Patnaude.

104. Mr. Patnaude did not possess the minimum required of 10 years of experience in leading major capital projects, specifically with respect to the City and State of New York owned infrastructure investments and capital budget portfolio.

105. By contrast, Plaintiff served as a director for York, with distinction, since 2002.

106. Mr. Patnaude does not hold any professional licenses.

107. By contrast, Plaintiff has held an architect's license for over 25 years.

108. The Executive Director of Facilities posting states that interfacing with unionized and public sector employers is highly desirable.

109. Mr. Patnaude had little to no public sector experience, as he has worked mostly for private entities.

110. By contrast, Plaintiff has worked for unionized, public sector employers for more than 30 years.

111. The Executive Director of Facilities job posting acknowledges the professional stature of licensed professionals, architects, and engineers.

112. However, in its position statement submitted to the EEOC, Defendant CUNY stated that Plaintiff's professional license did not assist his candidacy.

113. Defendant Thomas informed Plaintiff that he was not selected to the second round of interviews for the position

114. On numerous occasions during meetings, Mr. Thomas referred to the exercise of making facilities-related choices as being "like a Chinese menu," which is an insulting and discriminatory comment.

115. Such comment was made in Plaintiff's presence and other Asians in the group.

116. The Executive Director position became vacant on January 12, 2018, when the previous Executive Director, Mr. Minto, resigned.

117. Although the position remained vacant until September 2018, Defendants denied Plaintiff's request to serve as the Acting Executive Director during the search period even though Plaintiff was assigned and took over the management of high priority projects that Mr. Minto held.

118. On previous occasions, acting executive and managerial positions under Defendant Thomas' jurisdiction were awarded to other non-Asian employees, many of whom were black, but were otherwise similarly situated to Plaintiff.

119. At one time or another, all of the departments under Mr. Thomas's jurisdiction (Human Resources, Information Systems, Enrollment Management, Economic Workforce and Development, Public Safety, Budget and Planning), except Facilities Planning and Operations, had a standard, non-expedited search for an Executive Director.

120. Although Plaintiff possessed both seniority as well as planning and operations experience, he did not receive an interim appointment.

121. CUNY has claimed that it did not appoint Plaintiff as an interim Executive Director because it conducted an expedited search to fill the position permanently.

122. CUNY has not provided any basis for conducting an expedited search for the Facilities Department Executive Director position while conducting non-expedited searches to fill executive positions in other departments, during which time non-Asian interim Executive Directors were freely and routinely appointed.

123.   York College's Chief Administrative Superintendent, who is a white male, has previously expressed to Plaintiff that Plaintiff was deserving of serving as Executive Director of Facilities.

124.   In November 2018, Defendant Thomas started to assign inordinately burdensome tasks to Plaintiff that traditionally have been performed by appropriate maintenance department personnel, such as directing that Plaintiff check the physical condition of thousands of guest chairs.

125.   As a consequence of Defendant Thomas' outward bias and hostility towards Plaintiff, many of York College's executive directors and Vice Presidents have repeatedly addressed project matters directly to Plaintiff's subordinate, who reports directly to Plaintiff, without Plaintiff's knowledge or approval.

126.   Defendant Thomas and other York College Vice Presidents have addressed their technical email queries to Plaintiff and Plaintiff's subordinate jointly, furthering marginalizing Plaintiff.

127.   In July 2019, Mr. Patnaude's employment with York College terminated, rendering the Executive Director for Facilities Planning and Operations position vacant.

128.   A few days after the vacancy, Defendant Thomas assumed the role of Executive Director for Facilities Planning and Operations.

129.   On or about July 31, 2019, Plaintiff successfully secured reinstatement of his architect's registration with the State of New York and informed Defendant Thomas and the York College Executive Director for Human Resources  of his interest in filling the Executive Director for Facilities Planning and Operations on an interim and permanent basis.

130.    Since Mr. Patnaude's departure, Defendant Thomas has relied on Plaintiff to resolve the highly technical issues required of the Executive Director of Facilities Planning and Operations position.

131.    Defendants, however, have continued to fail to appoint, promote or hire Plaintiff to the position of Executive Director of Facilities Planning and Operations.

**FIRST CAUSE OF ACTION**
**(Failure to Hire Plaintiff Against**
**Defendant CUNY – Title VII, 42 U.S.C. § 2000e-2)**

132.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "131" of this complaint as though fully set forth at length herein.

133.    Plaintiff's race is Asian.

134.    Defendant CUNY failed to hire Plaintiff for the vacant position of Executive Director of Facilities Planning and Operations, posted in March 2018, on account of Plaintiff's race.

135.    Plaintiff's qualifications for the vacant position were so superior to the qualifications of the selected candidate, Mr. Partnaude, that no reasonable employer would have selected Mr. Partnaude for the position rather than Plaintiff.

136.    Mr. Partnaude is white.

137.    The decision to hire someone other than Plaintiff was made and/or heavily influenced by Defendant Thomas, who has a history of making comments offensive to Plaintiff's race.

138.    Since 2004, York College has not hired an Asian individual to an executive level position.

139. The Search Committee for the hire at issue was not comprised of any Asian individuals.

140. The Search Committee did not have any representation with the Facilities Department, which was inconsistent with protocol and past practice.

141. Although the posting for the position at issue indicated a preference would be given to candidates with professional licenses, Defendant CUNY has stated that Plaintiff's status as a licensed architect did not assist or support his candidacy for the position.

142. However, for years, Defendant CUNY took advantage of Plaintiff's status as an architect by requiring him to perform architect's tasks that were outside the scope of Plaintiff's job duties.

143. Defendant Thomas has articulated a false reason for non-selection of Plaintiff for the position at issue herein.

144. Defendant CUNY did not permit Plaintiff to serve in the capacity of interim Executive Director of Facilities Planning and Operations while the position was vacant from January 2018 to September 2018, even though other non-Asian individuals in other departments at York College held executive level positions on an interim basis.

145. Defendant CUNY cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein, nor can its actions be otherwise justified under Title VII.

146. Any alleged non-discriminatory reason is nothing more than a pretext so that Defendant CUNY could attempt to mask its actions.

147. By reason of Defendant CUNY's actions and inactions, whereby Defendant CUNY has engaged in unlawful discriminatory practices, Plaintiff has been severely damaged.

148. As a direct and proximate result of Defendant CUNY's willful, knowing and intentional discrimination, Plaintiff has suffered and will continue to suffer loss of earnings, job opportunities, employment benefits, retirement benefits and other incidental expenses.

149. As a result of Defendant CUNY's discrimination in violation of Title VII, Plaintiff has been damaged in an amount to be determined by a jury at the time of trial.

150. Plaintiff is entitled to equitable relief in the form of a Court order directing the Defendant CUNY to expunge all discriminatorily motivated material from Plaintiff's personnel and other employment-related files.

151. Plaintiff is additionally entitled to equitable relief in the form of a Court order directing the Defendant CUNY to hire Plaintiff to the position of Executive Director of Facilities Planning and Operations.

152. This violation is ongoing and continuing.

## SECOND CAUSE OF ACTION
### (Failure to Hire Plaintiff Against Defendant CUNY and Defendant Thomas – Violation of NYCHRL and NYSHRL)

153. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered "1" through "152" of this complaint as though fully set forth at length herein.

154. Plaintiff's race is Asian.

155. Defendant CUNY failed to hire Plaintiff for the vacant position of Executive Director of Facilities Planning and Operations, posted in March 2018, on account of Plaintiff's race.

156. Defendant Thomas selected the members of the Search Committee for the vacancy at issue.

157. Defendant Thomas strongly influenced the decision to decline Plaintiff's application for the vacancy at issue after Plaintiff's first round interview.

158. Defendant Thomas recommended the hiring of Mr. Partnaude for the vacancy at issue.

159. Defendant Thomas' recommendation as to the subject hiring decision carries significant weight and influence at York College.

160. Defendant Thomas actively participated in and heavily influenced the decision to hire Mr. Partnaude and to decline Plaintiff's application for the vacancy at issue.

161. Defendant Thomas has a history of making comments offensive to Plaintiff's race.

162. Plaintiff's qualifications for the vacant position were so superior to the qualifications of the selected candidate, Mr. Partnaude, that no reasonable employer would have selected Mr. Partnaude for the position rather than Plaintiff.

163. Mr. Partnaude is white.

164. Since 2004, York College has not hired an Asian individual to an executive level position.

165. The Search Committee for the hire at issue was not comprised of any Asian individuals.

166. The Search Committee did not have any representation with the Facilities Department, which was inconsistent with protocol and past practice.

167. Although the posting for the position at issue indicated a preference would be given to candidates with professional licenses, Defendant CUNY has stated that Plaintiff's status as a licensed architect did not assist or support his candidacy for the position.

168. However, for years, Defendant CUNY and Defendant Thomas took advantage of Plaintiff's status as an architect by requiring him to perform architect's tasks that were outside the scope of Plaintiff's job duties.

169. Defendant Thomas has articulated a false reason for non-selection of Plaintiff for the position at issue herein.

170. Defendant CUNY and Defendant Thomas did not permit Plaintiff to serve in the capacity of interim Executive Director of Facilities Planning and Operations while the position was vacant from January 2018 to September 2018, even though other non-Asian individuals in other departments at York College held executive level positions on an interim basis.

171. Defendant CUNY and its agents violated the New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq.* in that Defendant CUNY did not hire Plaintiff to the position in issue on account of Plaintiff's race.

172. Defendant Thomas is therefore liable to Plaintiff pursuant New York City Administrative Code § 8–107(1)(a) and New York Executive Law §296(1) due to his participation in the decision to deny Plaintiff's application for the position at issue.

173. Defendant Thomas is additionally liable to Plaintiff under New York City Administrative Code § 8–107(6) and New York Executive Law §296(6) for aiding and abetting Defendant CUNY's discriminatory failure to hire Plaintiff to the position at issue by heavily influencing said decision.

174. Defendants cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein, nor can their actions be otherwise justified under the New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq.*.

175. Any alleged non-discriminatory reason is nothing more than a pretext so that Defendants could attempt to mask their actions.

176. By reason of Defendants' actions and inactions, whereby Defendants have engaged in unlawful discriminatory practices, Plaintiff has been severely damaged.

177. As a direct and proximate result of Defendants' willful, knowing and intentional discrimination, Plaintiff has suffered and will continue to suffer loss of earnings, job opportunities, employment benefits, retirement benefits and other incidental expenses.

178. As a result of Defendants' discrimination in violation of the New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq.*, Plaintiff has been damaged in an amount to be determined by a jury at the time of trial.

179. Plaintiff is entitled to equitable relief in the form of a Court order directing the expungement of all discriminatorily motivated material from Plaintiff's personnel and other employment-related files.

180. Plaintiff is additionally entitled to equitable relief in the form of a Court order directing the Defendant CUNY to hire Plaintiff to the position of Executive Director of Facilities Planning and Operations.

## THIRD CAUSE OF ACTION
**(Failure to Promote Plaintiff Against
Defendant CUNY – Title VII, 42 U.S.C. § 2000e-2)**

181. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs "1" through "180" of this complaint as though fully set forth at length herein.

182. Plaintiff's race is Asian.

183. Defendant CUNY failed to promote Plaintiff to the vacant position of Executive Director of Facilities Planning and Operations, posted in March 2018, on account of Plaintiff's2

184. Plaintiff's qualifications for the vacant position were so superior to the qualifications of the selected candidate, Mr. Partnaude, that no reasonable employer would have selected Mr. Partnaude for the position rather than Plaintiff.

185. Mr. Partnaude is white.

186. The decision to offer the position to someone other than Plaintiff was made and/or heavily influenced by Defendant Thomas, who has a history of making comments offensive to Plaintiff's race.

187. Since 2004, York College has not hired or promoted an Asian individual to an executive level position.

188. The Search Committee for the employment decision at issue was not comprised of any Asian individuals.

189. The Search Committee did not have any representation with the Facilities Department, which was inconsistent with protocol and past practice.

190. Although the posting for the position at issue indicated a preference would be given to candidates with professional licenses, Defendant CUNY has stated that Plaintiff's status as a licensed architect did not assist or support his candidacy for the position.

191. However, for years, Defendant CUNY took advantage of Plaintiff's status as an architect by requiring him to perform architect's tasks that were outside the scope of Plaintiff's job duties.

192. Defendant Thomas has articulated a false reason for non-selection of Plaintiff for the position at issue herein.

193. Defendant CUNY did not permit Plaintiff to serve in the capacity of interim Executive Director of Facilities Planning and Operations while the position was vacant from January 2018 to September 2018, even though other non-Asian individuals in other departments at York College held executive level positions on an interim basis.

194. Defendant CUNY cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein, nor can its actions be otherwise justified under Title VII.

195. Any alleged non-discriminatory reason is nothing more than a pretext so that Defendant CUNY could attempt to mask its actions.

196. By reason of Defendant CUNY's actions and inactions, whereby Defendant CUNY has engaged in unlawful discriminatory practices, Plaintiff has been severely damaged.

197.    As a direct and proximate result of Defendant CUNY's willful, knowing and intentional discrimination, Plaintiff has suffered and will continue to suffer loss of earnings, job opportunities, employment benefits, retirement benefits and other incidental expenses.

198.    As a result of Defendant CUNY's discrimination in violation of Title VII, Plaintiff has been damaged in an amount to be determined by a jury at the time of trial.

199.    Plaintiff is entitled to equitable relief in the form of a Court order directing the Defendant CUNY to expunge all discriminatorily motivated material from Plaintiff's personnel and other employment-related files.

200.    Plaintiff is additionally entitled to equitable relief in the form of a Court order directing the Defendant CUNY to promote Plaintiff to the position of Executive Director of Facilities Planning and Operations.

201.    This violation is continuing and ongoing.

### FOURTH CAUSE OF ACTION
(**Failure to Hire Plaintiff Against Defendant CUNY and
Defendant Thomas – Violation of NYCHRL and NYSHRL)**

202.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs numbered "1" through "201" of this complaint as though fully set forth at length herein.

203.    Plaintiff's race is Asian.

204.    Defendant CUNY failed to promote Plaintiff to the vacant position of Executive Director of Facilities Planning and Operations, posted in March 2018, on account of Plaintiff's race.

205.    Defendant Thomas selected the members of the Search Committee for the vacancy at issue.

206. Defendant Thomas strongly influenced the decision to decline Plaintiff's application for the vacancy at issue after Plaintiff's first round interview.

207. Defendant Thomas recommended the hiring of Mr. Partnaude for the vacancy at issue.

208. Defendant Thomas' recommendation as to the subject hiring and/or promotional decision carries significant weight and influence at York College.

209. Defendant Thomas actively participated in and heavily influenced the decision to hire Mr. Partnaude and to decline Plaintiff's application for the vacancy at issue.

210. Defendant Thomas has a history of making comments offensive to Plaintiff's race.

211. Plaintiff's qualifications for the vacant position were so superior to the qualifications of the selected candidate, Mr. Partnaude, that no reasonable employer would have selected Mr. Partnaude for the position rather than Plaintiff.

212. Mr. Partnaude is white.

213. Since 2004, York College has not hired an Asian individual to an executive level position.

214. The Search Committee for the hire and/or promotion at issue was not comprised of any Asian individuals.

215. The Search Committee did not have any representation with the Facilities Department, which was inconsistent with protocol and past practice.

216. Although the posting for the position at issue indicated a preference would be given to candidates with professional licenses, Defendant CUNY has stated that Plaintiff's status as a licensed architect did not assist or support his candidacy for the position.

217. However, for years, Defendant CUNY and Defendant Thomas took advantage of Plaintiff's status as an architect by requiring him to perform architect's tasks that were outside the scope of Plaintiff's job duties.

218. Defendant Thomas has articulated a false reason for non-selection of Plaintiff for the position at issue herein.

219. Defendant CUNY and Defendant Thomas did not permit Plaintiff to serve in the capacity of interim Executive Director of Facilities Planning and Operations while the position was vacant from January 2018 to September 2018, even though other non-Asian individuals in other departments at York College held executive level positions on an interim basis.

220. Defendant CUNY and its agents violated the New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq.* in that Defendant CUNY did not promote Plaintiff to the position in issue on account of Plaintiff's race.

221. Defendant Thomas is therefore liable to Plaintiff pursuant New York City Administrative Code § 8–107(1)(a) and New York Executive Law §296(1) due to his participation in the decision to deny Plaintiff's application for the position at issue.

222. Defendant Thomas is additionally liable to Plaintiff under New York City Administrative Code § 8–107(6) and New York Executive Law §296(6) for aiding and abetting Defendant CUNY's discriminatory failure to promote Plaintiff to the position at issue by heavily influencing said decision.

223. Defendants cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein, nor can their actions be otherwise justified under the

New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq..*

224. Any alleged non-discriminatory reason is nothing more than a pretext so that Defendants could attempt to mask their actions.

225. By reason of Defendants' actions and inactions, whereby Defendants have engaged in unlawful discriminatory practices, Plaintiff has been severely damaged.

226. As a direct and proximate result of Defendants' willful, knowing and intentional discrimination, Plaintiff has suffered and will continue to suffer loss of earnings, job opportunities, employment benefits, retirement benefits and other incidental expenses.

227. As a result of Defendants' discrimination in violation of the New York State Executive Law § 296 and § 297, the New York City Human Rights Law and the New York City Administrative Code § 8-101 *et seq.*, Plaintiff has been damaged in an amount to be determined by a jury at the time of trial.

228. Plaintiff is entitled to equitable relief in the form of a Court order directing the expungement of all discriminatorily motivated material from Plaintiff's personnel and other employment-related files.

229. Plaintiff is additionally entitled to equitable relief in the form of a Court order directing the Defendant CUNY to hire Plaintiff to the position of Executive Director of Facilities Planning and Operations.

230. This violation is continuing and ongoing.

**FIFTH CAUSE OF ACTION**
**(Hostile Work Environment Based Upon Plaintiff's Race
under the New York City Human Rights Law
Against Defendant CUNY and Defendant Thomas)**

231.   Plaintiff hereby repeats and re-alleges each and every allegation contained within
paragraphs "1" through "230" as though fully set forth at length herein.

232.   Defendants have discriminated against Plaintiff on the basis of his race in violation
of the NYCHRL by subjecting Plaintiff to a hostile work environment based upon his
race.

233.   Plaintiff was treated less well than other employees of Defendant CUNY that were
outside of his protected class on account of his race.

234.   The actions constituting a hostile work environment were perpetuated by Plaintiff's
supervisor, Defendant Thomas.

235.   Defendant Thomas has a history of making comments offensive to Plaintiff's race.

236.   Defendants, and particularly Defendant Thomas, required Plaintiff to execute design
and construction documents that were required to be filed with the New York City
Department of Buildings because Plaintiff was a registered architect.

237.   Plaintiff and the York College construction crew, however, did not have the required
insurance and other required documents that were needed in order to lawfully sign
off on the College's documents and build based upon them.

238.   Plaintiff's job description did not include execution of design and construction
documents.

239.   Plaintiff's job description did not require him to be a registered architect.

240. Defendant Thomas incorrectly stated to Plaintiff on several occasions that CUNY is "exempt" from the Building Department requirements.

241. Defendants also demanded that Plaintiff engage in re-design work, in order to address an access claim under the Americans with Disabilities Act, with respect to York College's restrooms even though the necessary permitting was not obtained.

242. In November 2018, Defendant Thomas started to assign inordinately burdensome tasks to Plaintiff that traditionally have been performed by appropriate maintenance department personnel, such as directing that Plaintiff check the physical condition of thousands of guest chairs.

243. As a consequence of Defendant Thomas' outward bias and hostility towards Plaintiff, many of York College's executive directors and Vice Presidents have repeatedly addressed project matters directly to Plaintiff's subordinate, who reports directly to Plaintiff, without Plaintiff's knowledge or approval.

244. Defendant Thomas and other York College Vice Presidents address their technical email queries to Plaintiff and Plaintiff's subordinate jointly, furthering marginalizing Plaintiff.

245. In July 2019, Mr. Patnaude's employment with York College terminated, which left the Executive Director for Facilities Planning and Operations position vacant.

246. A few days after the vacancy, Defendant Thomas assumed the role of Executive Director for Facilities Planning and Operations.

247. Since Mr. Patnaude's departure, Defendant Thomas has relied on Plaintiff to resolve the highly technical issues required of the Executive Director of Facilities Planning and  Operations position even though Plaintiff does not hold this position.

248. Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to recover compensatory damages and punitive damages in an amount to be determined at trial, expungement of all discriminatory motivated records, together with appropriate interest thereon, and an award of attorneys' fees, expert fees, costs and disbursements.

249. This violation is continuing and ongoing.

## JURY DEMAND

250. Plaintiff herein demands a trial by jury of all issues in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully request that he be awarded the following relief:

a) On the first cause of action, appropriate injunctive and monetary relief, compensatory and punitive damages in an amount to be determined at trial, together with appropriate interest thereon;

b) On the second cause of action, appropriate injunctive and monetary relief, compensatory and punitive damages in an amount to be determined at trial, together with appropriate interest thereon;

c) On the third cause of action, appropriate injunctive and monetary relief, compensatory and punitive damages in an amount to be determined at trial, together with appropriate interest thereon;

d) On the fourth cause of action, appropriate injunctive and monetary relief, compensatory and punitive damages in an amount to be determined at trial, together with appropriate interest thereon;

e) On the fifth cause of action, appropriate injunctive and monetary relief, compensatory and punitive damages in an amount to be determined at trial, together with appropriate interest thereon;

f) An award of attorney's fees, expert fees, costs and disbursements; and

g) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
     November 20, 2019              Respectfully Submitted,

                        **THE SELTZER LAW GROUP P.C.**

                            /s/

By:  _____

                         Steven Seltzer
                    Counsel for Plaintiff
                    125 Maiden Lane, Suite 507
                    New York, New York 10038
                    T. (646) 863-1854
                    F. (646) 863-1877
                    Email: sseltzer@slg-ny.com